TROUTMAN SANDERS LLP
190 Moore Street
Hackensack, NJ 07601
Aurora Cassirer, Esquire
Email: aurora.cassirer@troutmansanders.com
Telephone: (201) 883-6400
Facsimile: (201) 884-6404
Attorneys for Plaintiff IDT Venture Capital Corporation d/b/a IDT JETS

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IDT VENTURE CAPITAL CORPORATION d/b/a IDT JETS | **JURY DEMAND** |
| Plaintiff, | |
| vs. | Case No. _____ |
| DARON WORLDWIDE TRADING INC. | |
| Defendant. | |

## COMPLAINT

Plaintiff IDT Venture Capital Corporation doing business as IDT JETS ("IDT," as used

herein, includes IDT's affiliates) files its Complaint against defendant Daron Worldwide Trading

Inc. ("Daron") and alleges as follows:

## INTRODUCTION AND SUMMARY

This action arises out of acts and practices of Daron which have the purpose and effect of

restraining trade in the market for the design and sale of aviation, land and marine-related models

and collectibles in North America and allowing Daron to monopolize that business in violation

of federal and state antitrust and other law.  Specifically, it is believed that Daron has coerced the

manufacturers and suppliers of aviation, land and marine-related models and collectibles to exclude IDT as well as other competitors from selling such products in North America.

IDT seeks injunctive relief to permit it to compete effectively, money damages which will be trebled where appropriate, punitive damages, attorneys' fees, disbursements and costs.

## THE PARTIES

1.     Plaintiff IDT Venture Capital Corporation is a wholly-owned subsidiary of IDT Corporation, a telecommunications, entertainment and technology company founded in 1990. IDT Venture Capital Corporation is organized and existing under the laws of the State of Delaware with its principal place of business at 520 Broad Street, Newark, New Jersey.  It has been doing business as IDT JETS since on or about January 1, 2006.

2.     Upon information and belief, defendant Daron is a corporation organized under the laws of the State of New Jersey with its principal place of business at 24 Stewart Place, Unit 4, Fairfield, New Jersey.  Upon information and belief, Daron is engaged in the business of designing and selling aviation, land, and marine-related models and collectibles.

## JURISDICTION & VENUE

3.     This is a Complaint under §§4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26) for damages and injunctive relief arising out of violations of §§1 and 2 of the Sherman Act (15 U.S.C. §§1 and 2) and §3 of the Clayton Act (15 U.S.C. §14), for actual and punitive damages and injunctive relief under the New Jersey Antitrust Act (N.J. Stat. Ann. 56:9-1 *et seq.*) and for damages arising out of New Jersey common law.  The Court has jurisdiction over the action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and principles of supplemental jurisdiction.

4.     Venue is proper in this district pursuant to 15 U.S.C. §22 and 28 U.S.C. §1391, and because all parties reside and transact business in this District and a substantial part of the events giving rise to the claims occurred in this District.

5.     Daron is engaged in interstate commerce and its activities substantially affect such commerce.

## ALLEGATIONS COMMON TO THE CLAIMS

6.     The business of designing and selling aviation, land and marine-related models and collectibles is a niche business with few competitors and which has approximately ten million dollars ($10,000,000) in annual sales in North America.  The entity which designs and sells such products typically acts in two stages.  First, the entity must negotiate and obtain rights from airlines and other transportation companies to place their trademarks directly on the products.  This is critical because a key part of the value of such models and collectibles derives from the presentation of trademarks of well known airlines and transportation companies (*i.e.*, American Airlines, Boeing, etc…) on the products.  Second, the entity then designs licensed products (which use such trademarks) to be sold (a) directly to those airlines and transportation companies who sell such products to customers in flight or during the course of a cruise; (b) to retailers such as airline toy stores and catalog companies; and (c) to individual customers through the internet and other means.

7.     Aviation, land and marine-related models and collectibles are not simply generic or "off the shelf" merchandise sold at regular toy stores, like fire engines or dolls.  They are often special projects which involve the cooperation of the airlines and transportation companies as well as the manufacturers in the design process.  The products are sold to niche retailers, such as

airline stores, airport shops and specialty catalog companies who target often sophisticated customers, many of whom are hobbyists and collectors, who purchase the products because of their design and affiliation with well-known aviation and transportation companies.

8.     In publicly-filed court documents, Daron has conceded that success in the business is based on strong relationships with: (a) the airlines and other transportation companies who sell their trademarks and purchase finished products for direct sales and (b) manufacturers and suppliers of the products.  Because the value of such collectibles and models is in large part connected to their affiliation with well-known airlines and transportation companies, maintaining a reputation for creativity and reliability with such companies is critical.

9.     To succeed in the business, it is critical to develop relationships with manufacturers and suppliers of aviation, land and marine-related models and collectibles.  Not every factory can practicably manufacture these types of models and collectibles.  Typically, the designer and seller of such products must identify manufacturers and suppliers (who are almost all located outside of North America) who have: (a) experience in the tooling and manufacturing process of these collectibles and models and (b) knowledge of the quality of the components of the models and collectibles, such as the type of metal or plastic and paint chips.  Then the designer/seller will commission samples of potential models and collectibles from the manufacturers and engage in a dialogue with them until, ultimately, the designer/seller is satisfied with the product.  Because the development of relationships with the manufacturers and suppliers of such models and collectibles is expensive and takes a prohibitive amount of time and resources, it is difficult to enter the business of designing and selling aviation, land and marine-related models and collectibles.

## ANTICOMPETITIVE CONDUCT

10.     In or about late 2005, IDT became aware that Bari Azman, the then-Marketing Manager of Daron, was interested in leaving the company due to, among other things, a deteriorating relationship with management. After analyzing the models and collectibles business, IDT, which already has extensive experience in the entertainment industry, determined that it was interested in entering the market. Accordingly, IDT began to make arrangements to do business as IDT JETS and negotiated with Mr. Azman to become President of IDT JETS.

11.     As of December 2005, Mr. Azman had over seven years experience in the business and an extensive successful track record of designing popular products and negotiating and working with airlines and transportation companies as well as manufacturers and suppliers of models and collectibles. As part of its business plan, IDT JETS intended to utilize Mr. Azman's extensive experience and relationships with contact people at these companies to enter into licensing agreements and design and develop new products, and thereby grow the business.

12.     On or about December 19, 2005, Mr. Azman gave notice of his intention to resign from Daron, at which time he was promptly escorted out of Daron's offices. Mr. Azman, who did not even have an employment agreement with Daron, never signed or otherwise agreed to any restrictive covenant or non-compete agreement. Further, the contacts and relationships that Mr. Azman developed while employed at Daron are not a trade secret and were never treated as such by Daron. Accordingly, as a matter of law, as of the date of resignation, Mr. Azman was free to contact and do business with: (a) his contacts at airline and transportation companies; (b) manufacturers and suppliers of aviation, land and marine-related models and collectibles; and (c) retailers and direct customers.

13.   Beginning on or about January 1, 2006, Mr. Azman and IDT JETS began developing the business.

14.   Upon information and belief, shortly after Mr. Azman's resignation, Daron, exploiting its dominant position and market share in the business, coerced, pressured or otherwise induced manufacturers and suppliers of aviation, land and marine-related models and collectibles to enter into agreements with Daron with the purpose and effect of boycotting or refusing to do business with IDT as well as other competitors.  As a direct result of the conduct by Daron and the pressured and/or cooperating entities, IDT has been prevented from effectively competing for business based on the quality of its services and the competitiveness of its prices.

15.   In fact, in letters it sent to manufacturers and suppliers of aviation, land and marine-related models and collectibles after Mr. Azman resigned, Daron, upon information and belief, fabricated the existence of a "longstanding" exclusivity agreement for the sole purpose of retraining trade and preventing competition with IDT and others.  The relevant excerpts of the "exclusivity agreements" read as follows:

> As you know, Daron is a distributor to the aviation industry and toy and hobby retailers of aviation, land, and marine-related toys, vehicles, and collectibles including, models, model sets, die-cast, plastic, and RC vehicles, kites, tops, puzzles, posters, dolls, and clothing. . .
>
> In consideration of the mutual promises and covenants set forth herein . . . we hereby agree as follows:  You will not sell products which are the same as or similar to the types of products that are Daron's Products to any entity that you have reason to believe intends on selling those products (directly or indirectly) either (i) in *North America*; or (ii) for sale on-board the airline or through dedicated airline company stores.  (Emphasis supplied).

16.   Upon information and belief, with one or two exceptions, this or any exclusivity agreement has not been used by Daron in the past and was not part of any contract or other

agreement (whether written or oral) until: (a) after Mr. Azman's resignation and (b) Daron came to believe that Mr. Azman would be employed by a competitor. By its very terms, this exclusivity agreement effectively precludes any competitor, including IDT, from distributing what is amorphously described as the "same or similar" types of products (*i.e.*, aviation, land, and marine-related toys, vehicles, and collectibles including, models, model sets, die-cast, plastic, and RC vehicles, kites, tops, puzzles, posters, dolls, and clothing) from these key manufacturers and suppliers of such products anywhere in North America or on any plane or in any airline store.

17.    In addition, in furtherance of its extensive efforts to exclude IDT, in late January of 2006, Daron filed an action in the United States District Court for the District of New Jersey against Mr. Azman and obtained a temporary restraining order against him under false pretenses for the objectively baseless purpose of harassing him and IDT and preventing IDT from successfully competing in the market. In that action, encaptioned *Daron Worldwide Trading, Inc. v. Bari Azman and XYZ Company*, Civil Action No. 2:06-CV-0365, U.S.D.C.N.J. (DMC/MF) ("*Daron v. Azman*"), Daron sought, among other things, a preliminary injunction to enjoin Azman from directly or indirectly contacting or doing business with any airline, transportation company, manufacturer, supplier or other entity which he did business with or became aware of while employed by Daron. Apparently seeing through Daron's wrongful and anticompetitive effort to misuse the courts, the District Court there (a) *denied* Daron's application for a preliminary injunction and (b) lifted the temporary restraints against Bari Azman in light of the misinformation the Court received regarding Azman's representation by Daron.

## THE RELEVANT MARKET

18.     The design and sale of aviation, land and marine-related models and collectibles is a relevant product market for antitrust purposes.  As noted above, these products are not reasonably interchangeable with toys or any other types of models or collectibles because they are specialty items and not simply generic or "off the shelf" merchandise sold at regular toy stores.  Further, much of their value comes in the uniqueness of their design and because they possess trademarks from prestigious airlines and transportation companies.  Retailers and customers (including airlines) view these products as unique and not interchangeable with other types of toys, models or collectibles.  Thus, those who design and sell aviation, land and marine-related models and collectibles do not compete with other toy or other designers and distributors for customers.

19.     Further, upon information and belief, the manufacturers and suppliers of aviation, land and marine-related models tend not to manufacture other types of generic toys, models and collectibles.

20.     North America is the relevant geographic market for purposes of this case.  As a general matter, those who purchase aviation, land and marine-related models and collectibles in North America will not purchase such products elsewhere in the world, because among other reasons, they are more expensive elsewhere.  Further, Daron's anticompetitive and exclusionary conduct has been explicitly targeted at stifling competition for the design and sale of aviation, land and marine-related models and collectibles in North America, and its effects have been felt by competitors and the public in North America as well as by the manufacturers/suppliers of such products to North America.

## MONOPOLY POWER AND SHARE

21.     By virtue of its power to exclude IDT and what is presently believed to be at least

an 80% share of the revenues generated for the design and sale of aviation, land and marine-

related models and collectibles in North America for the past few years, Daron has monopoly

power and a dominant market share in North America or there is a dangerous probability that it

will acquire such power in the relevant market.

## EFFECT ON COMPETITION AND IDT

22.     As a result of the conduct described above and other acts and practices not

currently known, there has been a reduction in competition for the design and sale of aviation,

land and marine-related models and collectibles in North America.  IDT has been denied the

ability to compete for the business and, as a result of the exclusion, airlines, transportation

companies, manufacturers, suppliers and retailers are essentially limited to dealing with Daron

and the public is restricted from having access to alternative products at competitive prices which

it would otherwise have in a properly competitive environment.  These effects are not

attributable to Daron being selected over competition based on fair competition, but flow from

its domination of the market which have the effect of preventing IDT and competitors from

securing such business as they would if decisions were based on choices unaffected by the acts

and practices described above.

23.     IDT has made strong, but too often unsuccessful, efforts to enter the market but

has been prevented from effectively doing so based on Daron's wrongful conduct, including,

among other things, its sham and anticompetitive temporary restraining order against Mr. Azman

and other presently known and unknown false representations about the status of that litigation to

potential customers.  Even though it is an enormously successful company which has hired an

experienced and respected member of the industry, IDT JETS has not been able to properly

compete for such business in North America.  Absent the relief requested herein, airlines,

transportation companies, manufacturers, suppliers and retailers will not be able to make free

choices unaffected by the conduct of Daron.  The public has been denied and will continue to be

denied access to a greater selection of aviation, land and marine-related models and collectibles

that are priced competitively.

24.     The above described acts and practices have resulted in some manufacturers and

suppliers limiting themselves to Daron-designed and sold products, which is inconsistent with

the typical practices of manufacturers and suppliers when operating in a competitive market.

Typically, they would want to contract with as many designers and sellers of aviation, land and

marine-related models and collectibles as possible in order to attract more business.

25.     As a result of the foregoing, Daron's substantial market power in the relevant

market for the design and sale of aviation, land and marine-related models and collectibles in

North America has increased.  Moreover, there has been or will be further concentration in an

already concentrated market, with a corresponding reduction in the quality of aviation, land and

marine-related models and collectibles and a general distortion of the competitive process.

26.     As a result of the foregoing, IDT has been denied past sales and profits, and its

reputation has been impaired.

27.     Unless Daron is enjoined, it will continue its pattern and practices described

above with continuing impact on competition, on IDT and on the public.

## COUNT I

**(Monopolization By Daron Of The Market For The Design and Sale of Aviation, Land and Marine-Related Models And Collectibles In Violation Of Section 2 Of The Sherman Act)**

28.    IDT hereby repeats and realleges each and every allegation in the preceding paragraphs.

29.    As a result of the acts and practices and anticompetitive behavior described above, Daron has monopoly power and a dominant share of the market for the design and sale of aviation, land and marine-related models and collectibles in North America which, upon information and belief, is currently in excess of 80% of revenues generated for the sale of such products in North America in recent years.

30.    In addition to its dominant share of the market, Daron has the power to exclude competition from the market and has exercised the power to exclude, at least, IDT for purposes of obtaining or maintaining its monopoly.

31.    As a consequence of Daron's monopolization of the market for the design and sale of aviation, land and marine-related models and collectibles in North America, IDT has lost business and revenues and been injured in its business and property.

## COUNT II

**(Attempted Monopolization By Daron Of The Market For The Design And Sale Of Aviation, Land And Marine-Related Models And Collectibles In Violation Of Section 2 Of The Sherman Act)**

32.    IDT hereby repeats and realleges each and every allegation in the preceding paragraphs.

33.     Daron has the specific intention to monopolize the market for the design and sale of aviation, land and marine-related models and collectibles in North America and has engaged in predatory and anticompetitive conduct in order to accomplish that goal, including such presently known conduct as: (a) coercing or convincing, and combining with, manufacturers and suppliers of aviation, land and marine-related models and collectibles to boycott, or refuse to deal with, IDT; and (b) pursuing a sham and frivolous temporary restraining order against Mr. Azman for the purpose of harassing him and IDT and preventing competition in the relevant market.

34.     To the extent Daron does not yet have monopoly power, there is a dangerous probability that Daron will obtain monopoly power due to, among other things, its market share and stranglehold on the market.

35.     As a consequence of Daron's attempted monopolization of the market for the design and sale of aviation, land and marine-related models and collectibles in North America, IDT has lost business and revenues and been injured in its business and property.

## COUNT III

**(Violation Of Section 1 Of The Sherman Act And Section 3 Of The Clayton Act By Contracts, Combinations Or Conspiracies Between Daron And Manufacturers And Suppliers Which Have Impacted The Market For The Design and Sale of Aviation, Land And Marine-Related Models And Collectibles)**

36.     IDT hereby repeats and realleges each and every allegation in the preceding paragraphs.

37.     Daron and IDT compete in the relevant market for the design and sale of aviation, land and marine-related models and collectibles in North America.

38.    These products are sold in interstate commerce and the volume is substantial.

39.    By virtue of the acts and practices described above, including those "exclusive" arrangements between Daron and the manufacturers and suppliers of aviation, land and marine-related models and collectibles covering North America, IDT and, upon information and belief, others, have been denied the ability to effectively compete for contracts with such manufacturers and suppliers, despite extensive experience and a strong reputation with them.

40.    Upon information and belief, Daron has entered into contracts or other arrangements with the manufacturers and suppliers of aviation, land and marine-related models and collectibles which have the effect of preventing those companies from dealing with and selling products to IDT in North America.  As a consequence, IDT is effectively precluded from selling such products in North America.

41.    By the acts, practices and agreements described above, Daron has substantially foreclosed competition in the relevant market for the design and sale of aviation, land and marine-related models and collectibles in North America and adversely impacted and affected a not insubstantial amount of interstate commerce by, *inter alia*, excluding IDT and others from contracting with the manufacturers and suppliers of such products.

42.    IDT has been injured by this suppression of competition in the relevant market.

## COUNT IV

**(Monopolization By Daron Of The Market For The Design and Sale of Aviation, Land and Marine-Related Models And Collectibles In Violation Of Section 56:9-4 of the New Jersey Antitrust Act)**

43.     IDT hereby repeats and realleges each and every allegation in the preceding

paragraphs.

44.     As a result of the acts and practices and anticompetitive behavior described

above, Daron has monopoly power and a dominant share of the market for the design and sale of

aviation, land and marine-related models and collectibles in North America which, upon

information and belief, is currently in excess of 80% of revenues generated for the sale of such

products in North America in recent years.

45.     In addition to its dominant share of the market, Daron has the power to exclude

competition from the market and has exercised the power to exclude, at least, IDT for purposes

of obtaining or maintaining its monopoly.

46.     As a consequence of Daron's monopolization of the market for the design and

sale of aviation, land and marine-related models and collectibles in North America, IDT has lost

business and revenues and been injured in its business and property.

## COUNT V

**(Attempted Monopolization By Daron Of The Market For The Design And Sale Of
Aviation, Land And Marine-Related Models And Collectibles In Violation Of 56:9-4 of the
New Jersey Antitrust Act)**

47.     IDT hereby repeats and realleges each and every allegation in the preceding

paragraphs.

48.     Daron has the specific intention to monopolize the market for the design and sale

of aviation, land and marine-related models and collectibles in North America and has engaged

in predatory and anticompetitive conduct in order to accomplish that goal, including such

presently known conduct as: (a) coercing or convincing, and combining with, manufacturers and suppliers of aviation, land and marine-related models and collectibles to boycott, or refuse to deal with, IDT; and (b) pursuing a sham and frivolous temporary restraining order against Mr. Azman for the purpose of harassing him and IDT and preventing competition in the relevant market.

49.    To the extent Daron does not yet have monopoly power, there is a dangerous probability that Daron will obtain monopoly power due to, among other things, its market share and stranglehold on the market.

50.    As a consequence of Daron's attempted monopolization of the market for the design and sale of aviation, land and marine-related models and collectibles in North America, IDT has lost business and revenues and been injured in its business and property.

## COUNT VI

**(Violation Of 56:9-3 of the New Jersey Antitrust Act By Contracts, Combinations Or Conspiracies Between Daron And Manufacturers And Suppliers Which Have Impacted The Market For The Design and Sale of Aviation, Land And Marine-Related Models And Collectibles)**

51.    IDT hereby repeats and realleges each and every allegation in the preceding paragraphs.

52.    Daron and IDT compete in the relevant market for the design and sale of aviation, land and marine-related models and collectibles in North America.

53.    The volume of these products sold is substantial.

54.    By virtue of the acts and practices described above, including those "exclusive" arrangements between Daron and the manufacturers and suppliers of aviation, land and marine-

related models and collectibles, IDT and, upon information and belief, others, have been denied the ability to effectively compete for contracts with such manufacturers and suppliers, despite extensive experience and a strong reputation with them.

55.    Upon information and belief, Daron has entered into contracts or other arrangements with the manufacturers and suppliers of aviation, land and marine-related models and collectibles which have the effect of preventing those companies from dealing with and selling products to IDT in North America.  As a consequence, IDT is precluded from selling such products in North America.

56.    By the acts, practices and agreements described above, Daron has substantially foreclosed competition in the relevant market for the design and sale of aviation, land and marine-related models and collectibles in North America and adversely impacted and affected a not insubstantial amount of commerce by, *inter alia*, excluding IDT and others from contracting with the manufacturers and suppliers of such products.

57.    IDT has been injured by this suppression of competition in the relevant market.

## COUNT VII

**(Daron's Tortious Interference With IDT's Prospective Economic Advantage)**

58.    IDT hereby repeats and realleges each and every allegation in the preceding paragraphs.

59.    The conduct of Daron as described above constitutes tortious interference with IDT's prospective economic advantage, under New Jersey law, with (a) airlines and other transportation companies who sell their trademarks and purchase finished products for direct

sales and (b) suppliers and manufacturers of aviation, land and marine-related models and collectibles.

60.     Specifically, among other things, in light of IDT's relationship with Mr. Azman as well as its business capabilities, there is and at all relevant times has been a reasonable probability that IDT would have entered into business relationships with such parties. However, the independently tortious and wrongful conduct of Daron as described above has proximately caused compensable harm and damage to IDT by virtue of Daron's: (a) violation of antitrust laws; (b) effort to obtain a temporary restraining order under false pretenses against Mr. Azman; and (c) misleading and improper communications to customers implying that Mr. Azman was responsible for somehow violating Daron's legal rights.  This conduct has caused others to refuse to deal with IDT.

61.     The conduct of Daron as described above was undertaken intentionally, wantonly and maliciously so as to justify the award of exemplary damages in an amount to be determined by the trier of fact.

WHEREFORE, plaintiff IDT Venture Capital Corporation d/b/a IDT JETS hereby demands the following relief:

1.     Actual and trebled damages for the federal antitrust violations against Daron as provided by law (Counts I-III);

2.     Actual and trebled damages, where appropriate, against Daron for the state law violations as provided by law (Counts IV-VII);

3.     An award of punitive damages;

4.     Costs, attorneys' fees and disbursements; and

5.     An injunction against defendant Daron in such form as this Court may deem just and proper, restraining violations by Daron of the laws of the United States and of the State of New Jersey.

## JURY DEMAND

Plaintiff IDT Venture Capital Corporation d/b/a IDT JETS hereby demands a trial by jury.

IDT VENTURE CAPITAL CORPORATION d/b/a IDT JETS

By _____
                 Of Counsel

Aurora Cassirer, Esquire
Daniel N. Anziska, Esquire

TROUTMAN SANDERS LLP
190 Moore Street
Hackensack, NJ 07601
(201) 883-6400

The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 704-6000